STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2021 CA 0988

GREGORY SEAL

VERSUS

LOUISIANA FARM BUREAU MUTUAL INSURANCE COMPANY

*DATE OF JUDGMENT:*  **MAR 1 6 2022**

ON APPEAL FROM THE NINETEENTH JUDICIAL DISTRICT COURT
NUMBER 670599, SECTION 22, PARISH OF EAST BATON ROUGE
STATE OF LOUISIANA

HONORABLE TIMOTHY E. KELLEY, JUDGE

\* \* \* \* \* \*

| | |
|---|---|
| Brandon A. Brown<br>Baton Rouge, Louisiana | Counsel for Plaintiff-Appellant<br>Gregory Seal |
| Mark T. Assad<br>Baton Rouge, Louisiana | Counsel for Defendant-Appellee<br>Louisiana Farm Bureau Mutual<br>Insurance Company |
| R. Heath Savant<br>Baton Rouge, Louisiana | |

\* \* \* \* \* \*

BEFORE: GUIDRY, HOLDRIDGE, AND CHUTZ, JJ.

Disposition: **REVERSED AND REMANDED.**

Guidry, J. Concurs in the result.

**CHUTZ, J.**

Plaintiff-appellant, Gregory Seal, appeals the trial court's summary judgment dismissal of his claims against defendant-appellee, Louisiana Farm Bureau Mutual Insurance Company (LFB), in which he sought damages from the insurer after the loss of his home by fire.

## FACTUAL AND PROCEDURAL HISTORY

The following facts are undisputed in this appeal. On June 30, 2017, a house owned by Seal, located at 27220 Nobles Cemetary Road in Franklinton, Louisiana (the Nobles Cemetary Rd property), was destroyed by fire. The house had been continuously insured by LFB since December 13, 2005, when it was originally constructed. When Seal subsequently made a claim for the losses he sustained on June 30, 2017, he was advised that his homeowner's policy had been cancelled.

On June 19, 2018, Seal instituted this lawsuit, naming LFB as a defendant, averring that "any attempted cancellation of the [LFB homeowner's policy] was invalid and violated the terms and conditions of the policy." LFB subsequently answered the lawsuit and filed a motion for summary judgment. After a hearing on the motion, the trial court found LFB had complied with the statutory requirements for the cancellation and granted summary judgment, dismissing all of Seal's claims against LFB. A judgment in conformity with the trial court's oral ruling was signed on May 4, 2021. After the trial court denied his motion for new trial, Seal appealed.

## DISCUSSION

A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. A summary judgment is reviewed on appeal de novo with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate, i.e., whether there is any genuine issue of material fact,

2

and whether the movant is entitled to judgment as a matter of law. *Beer Indus. League of Louisiana v. City of New Orleans*, 2018-0280 (La. 6/27/18), 251 So.3d 380, 385-86.

The Code of Civil Procedure places the burden of proof on the party filing a motion for summary judgment. See La. C.C.P. art. 966(D)(1). The mover can meet this burden by filing supporting documentary evidence. La. C.C.P. art. 966(A)(4). The mover's supporting documentary evidence must prove the essential facts necessary to carry its burden. Thus, in deciding a motion for summary judgment, we must first determine whether the supporting documents presented by the mover are sufficient to resolve all material fact issues. *Jenkins v. Hernandez*, 2019-0874 (La. App. 1st Cir. 6/3/20), 305 So.3d 365, 370-71, writ denied, 2020-00835 (La. 10/20/20), 303 So.3d 315. A fact is material if it potentially ensures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. *Walker v. City of Independence Police Dep't*, 2018-1739 (La. App. 1st Cir. 2/7/20), 296 So.3d 25, 30.

Factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing a motion for summary judgment, and all doubt must be resolved in the opponent's favor. *Thompson v. Ctr. for Pediatric and Adolescent Medicine, L.L.C.*, 2017-1088 (La. App. 1st Cir. 3/15/18), 244 So.3d 441, 445, writ denied, 2018-0583 (La. 6/1/18), 243 So.3d 1062. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can only be seen in light of the substantive law applicable to the case. *Pumphrey v. Harris*, 2012-0405 (La. App. 1st Cir. 11/2/12), 111 So.3d 86, 89.

3

An insurance policy is a contract between the insured and insurer and has the effect of law between them. *Gorman v. City of Opelousas*, 2013-1734 (La. 7/1/14), 148 So.3d 888, 892.[1] When the words of an insurance contract are clear and explicit and lead to no absurd consequences, courts must enforce the contract as written and may make no further interpretation in search of the parties' intent. *Id.*[2] Words and phrases in an insurance policy are to be construed using their plain, ordinary, and generally prevailing meaning unless the words have acquired a technical meaning. *Maldonado v. Kiewit Louisiana Co.*, 2013-0756 (La. App. 1st Cir. 3/24/14), 146 So.3d 210, 218.[3]

The burden of proving a policy has been cancelled is upon the party alleging it. See 2 *Couch on Ins.* §30:19. In other words, when an insurer seeks to avoid coverage through summary judgment, it is incumbent on the insurer to prove the basis for its avoidance of coverage. See *Halphen v. Borja*, 2006-1465 (La. App. 1st Cir. 5/4/07), 961 So. 2d 1201, 1204, writ denied, 2007-1198 (La. 9/21/07), 964 So. 2d 338 (insurer bore burden of proving uninsured/underinsured benefits did not apply to plaintiff's claim).

According to the salient provisions of the homeowner's policy at issue in this case, LFB "may cancel by mailing written notice to the named insured shown in the Declarations at the address shown in this policy with ... at least 30 days notice." **SECTIONS I AND II – CONDITIONS**, 4(c)(3). Since the homeowner's policy had been in effect and renewed for more than three years, the policy provided that LFB "may cancel ... if the insured risk has undergone a material change." **SECTIONS I AND II – CONDITIONS**, 4(e)(3). The homeowner's policy does not define the phrase "the insured risk has undergone a material

---

[1] See La. C.C. arts. 1906 and 1983.

[2] See La. C.C. art. 2046.

[3] See La. C.C. art. 2047.

4

change." Thus, under the unambiguous terms of the insurance agreement, this specified basis of cause to cancel the homeowner's policy was antecedent to LFB's right to undertake the cancellation.[4]

In addition to the homeowner's policy terms, La. R.S. 22:887 addresses cancellation of insurance policies, stating in relevant part:

> A. Cancellation by the insurer of any policy which by its terms may be cancelled at the option of the insurer ... may be effected as to any interest only upon compliance ... of the following:
>
> (1)(a) Written notice of such cancellation must be actually delivered or mailed to the insured or to his representative in charge of the subject of the insurance not less than thirty days prior to the effective date of the cancellation ....
>
> B. The mailing of any such notice shall be effected by depositing it in a sealed envelope, directed to the addressee at his last address as known to the insurer or as shown by the insurer's records, with proper prepaid postage affixed, in a letter depository of the United States Post Office. ...
>
> C. The affidavit of the individual making or supervising such a mailing, shall constitute prima facie evidence of such facts of the mailing as are therein affirmed. ...
>
> H. Notice of cancellation or nonrenewal given by the insurer in accordance with this Chapter shall be deemed sufficient. The producer shall not be required to give any separate or additional notice of cancellation or nonrenewal.

In support of its motion for summary judgment, LFB attached excerpts from the depositions of Seal; an LFB field underwriter, Adina Davis; and, an LFB regional underwriter manager, Lauren Thomas. A certified copy of the homeowner's policy issued to Seal for the Nobles Cemetary Rd property was also attached. Attachments to Thomas's deposition excerpts, including a copy of a

---

[4] We note other salient provisions in the homeowner's policy include in the Declarations that "[t]he described residence premises covered by this policy is located at the above address, unless otherwise stated." The address of the Nobles Cemetery Rd property is set forth and the description further provides as the location "WASHINGTON PARISH (FIRE DISTRCT 4)." "[R]esidence premises" is defined as "the one family dwelling, other structures and grounds ... where you reside and which is shown as the residence premises in the Declarations." **DEFINITIONS**, 13(a). Additionally, "[i]n this policy, 'you' and 'your' refer to the named insured shown in the Declarations." And an "insured" is defined, among other things, as "you and residents of your household who are ... your relative." **DEFINITIONS & DEFINITIONS**, 5(a).

Notice of Cancellation dated February 15, 2017, addressed to Seal at the Nobles Cemetary Rd property, were also considered as part of LFB's motion for summary judgment.[5]

The last item attached to LFB's motion was the affidavit of Property Policy Services Manager, Lisa O'Quinn, who attested that she was responsible for evaluating and maintaining the status of homeowner's insurance coverage for insured properties in Louisiana, including the payment of premiums, underwriting issues, and the cancellation of homeowner's policies. O'Quinn stated that on February 15, 2017, LFB sent a notice of cancellation to Seal at the address of the Nobles Cemetary Rd property, advising that it was necessary to discontinue his homeowner's insurance protection and that the cancellation was effective at 12:01 A.M., March 17, 2017.[6] O'Quinn also identified a document, entitled "PROOF OF MAIL," signed by the postmaster that showed a letter addressed to Seal at the Nobles Cemetary Rd property among the list of letters that LFB sent out on February 15, 2017.

In the deposition excerpts, LFB established that due to a fire in 2015 affecting one of the out buildings on Seal's premises, LFB Field Underwriter Davis inspected the Nobles Cemetary Rd property to ensure that the building had been removed or replaced. While she was inspecting the premises, Seal advised her "that he hadn't been staying in the home and that his son who battled addiction … resided in the home." She recalled having looked inside the house through a window and that "the home didn't appear to be lived in." She elaborated, "There

---

[5] Additionally, the record contains a declaration sheet, dated February 17, 2017, indicating that the term of Seal's homeowner's policy "SHALL BE CANCELLED AS OF 03/17/2017." There is nothing in the record to show whether that declaration sheet was sent to or received by Seal.

[6] Although O'Quinn stated the February 15, 2017 notice advised Seal that the policy "was being cancelled for underwriting reasons," it did not. See La. R.S. 22:887A(1)(b) ("Upon the written request of the named insured, the insurer shall provide to the insured in writing the reasons for cancellation of the policy. There shall be no liability and no cause of action shall arise against any insurer … for any action taken by them to provide the reasons for cancellation as required by this Subparagraph.").

was a few items scattered around and about in the home. There wasn't any order or structure and minimal furniture." Davis acknowledged that she did not know if there was electrical service supplied to the property.

According to the excerpts offered by LFB of Thomas's deposition testimony, among the reasons LFB can cancel a policy is if there has been a material change in the risk being insured. While acknowledging the policy does not define "a material change of risk," Thomas stated that LFB "normally consider[s] [it] a material change in the risk when the occupancy changes from being occupied by the named insured to being ... vacant or occupied by someone else." Based on Davis's report sent after the inspection, LFB determined that Seal was not living in the home anymore.[7] Thomas conceded that she did not know the source of Davis's conclusion that the home was no longer owner occupied and offered no other information for LFB's conclusion that the house was no longer occupied by Seal other than Davis's inspection report.

LFB urged that because its supporting documents showed that LFB considers the failure of an insured to maintain a home as owner occupied to constitute a material change of risk and Davis's testimony supports a finding that the house was not lived in by Seal, the policy was correctly cancelled pursuant to the policy's terms. Additionally, since LFB demonstrated that it notified Seal of the cancellation in conformity with the statutory requirements set out in La. R.S. 22:887, it sustained its burden of establishing it effectively cancelled the homeowner's policy as of March 17, 2017. Since Seal's homeowner's policy was cancelled over three months before the fire, LFB urges that it demonstrated through the attachments to its motion that there was no coverage on June 30, 2017, and it is entitled to summary judgment dismissal of all of Seal's claims.

_____

[7] Thomas referred to Davis as "Adina Fisher" in her deposition testimony.

In response to LFB's showing, Seal offered his complete deposition testimony as well as that of Davis and Thomas along with the attachments to the depositions. Although most of the attached items replicated those offered by LFB, Seal's offering also included the inspection report completed by Davis dated February 1, 2017. With this responsive showing, Seal avers that there remain outstanding issues of material fact as to whether LFB's attempted cancellation of the homeowner's policy was a valid one or if it violated of the terms and conditions of the policy.

In his deposition testimony, Seal stated that he had lived in the Nobles Cemetary Rd property continuously from the day it was built until it burned down in 2017. During those years, he had two significant others who resided with him at different times. The last one moved out in 2016. In June 2017, his eldest son, Dylan, who was approximately 25, resided with him. His two minor children also lived with him pursuant to a 50/50 shared custody arrangement with the children's mother. Seal explained that he had rental property located about 100 yards from his Nobles Cemetary Rd property and that his parents lived in a house which was across a field about 200 yards away from his home, which is where he has been living since the fire.

Seal testified that the Nobles Cemetary Rd property was mortgaged, his payments on the mortgage were delinquent leading into 2017, and the bank was foreclosing. But Seal maintained and it is undisputed that the bank had escrowed the premiums for the insurance and the policy was fully paid at the time of the cancellation. Seal recalled having learned after the fire that the bank had been reimbursed the unused portion of the premium.

Seal denied he was ever advised by LFB that his homeowner's policy was being cancelled either verbally or in writing. Although he confirmed the accuracy of the address and admitted that he was unaware of the postal service having held

8

his mail, Seal specifically stated he had not seen the February 15, 2017 notice of cancellation at any time before his home was destroyed by fire. He testified that he regularly checked his mailbox in February 2017, describing how it was located down the driveway on the side of the Nobles Cemetary Rd roadway. After the June 30, 2017 fire, Seal made a claim over the phone. He received a call from a representative of LFB who advised Seal that the homeowner's policy had been cancelled and that he had been notified of the cancellation by letters.

In her complete deposition testimony, in addition to the testimony set forth in the excerpts offered by LFB, Davis provided the following information. As a field underwriter, she had to assess risks and make sure the risks LFB was insuring met the insurer's company guidelines. If not, LFB would advise the insureds that they were not meeting its guidelines or LFB would adjust the insureds' policies in an attempt to meet the risks. The company's underwriting guidelines, published on the LFB website, were only accessible with company permission and not to the public generally.

Davis testified that when she inspected the property on February 1, 2017, she was accompanied by Dakota Fitzgerald, the Washington Parish Agency Manager for LFB. Davis explained that the agent who sold the homeowner's policy to Seal had retired and that Fitzgerald had taken over the "book of business for [the retired] agent," which apparently included Seal's account. After identifying her February 1, 2017 inspection report, Davis said that she remembered the inspection of the Nobles Cemetary Rd property, but agreed that looking at the report helped to refresh her memory and that she had read it in preparation for the deposition.

Davis recalled that at the time of the inspection, she looked at the sides, the front, and the back of the home, and that Fitzgerald knocked on the door. After a short while, Seal drove up and asked Davis and Fitzgerald what they were doing

9

and who they were. Fitzgerald explained the purpose of LFB's visit, and according to Davis, Seal advised her that he had not been staying in the home but that his adult son, who battles drug addiction, resided in the home. Davis testified that Seal provided no other details about his use of the property. She had no idea why Seal had not been staying in the home, did not talk to anyone else – not even Dylan Seal – about Seal's living situation, and did not go inside the home. Davis admitted she had no information on whether the house received electrical, water, or other utility services, pointing out that she did not have access to that information. Although she took nine photographs of the premises, they are not included in the record. Davis agreed that once Seal told her that "he wasn't living in the house[,] that gave [her] the information to know [the house] was no longer owner occupied" and "[t]here was no need to get other information" since he had admitted he "wasn't living there."

A close scrutiny of the February 1, 2017 inspection report prepared by Davis shows the following. The dwelling condition, premises condition, and the electrical condition are checked as "Unacceptable." The paint condition, roof condition, and out building condition were checked as "Acceptable." "Yes" was checked for "Trash Debris." And "Decline Renewal," rather than the other options of "Approved" or "Rejected," was checked under "Recommendation." An area entitled "Comments" stated the following:

> Shop has been removed. Insured has materials, post have been put up but not yet completed. Insured advised that he hasn't stayed in the home in 12 months and doesn't occupy the home full time. Son now resides in the home and battles addiction. Pool is empty and the upkeep of the premises is poor. Several items spread out and there's a broken window on the dwelling. Recommend cancelling due to the home not being [sic].

In addition to the excerpted testimony provided by LFB, Thomas's complete deposition revealed that LFB bases its determination of whether a home is occupied by an owner on "what the circumstances are." Thomas stated that LFB

10

usually communicates with the agent and "if they tell us no, the person is no longer living there, then we tell them we have to cancel the policy." If, however, the agent advises that the owner is "visiting so-and-so in another country" and will be back at a specific time, LFB normally does not do anything. If the circumstances indicate it is a changing situation, LFB will "follow up sometimes." But according to Thomas, LFB does not "randomly cancel policies because people are not living there seven days a week." She explained that LFB usually works alongside the agent to communicate what action needs to be taken and that it is the agent who communicates with the insured. Thomas was unable to identify any efforts made by LFB to communicate with Seal about his living situation and found nothing in Seal's homeowner's policy file indicating any efforts had been undertaken.

According to Thomas, in addition to the notice LFB had sent to Seal, a notice of cancellation was also sent to the bank that held the mortgage on the Nobles Cemetary Rd property. Without specifying a date, Thomas noted that a refund of the unused portion of the premium was sent to the bank and Seal, but it was addressed to the bank since it was the party to whom the money was owed.

Based on the showing made, we find outstanding issues of material fact preclude summary judgment. Although Davis indicated in her testimony that Seals stated "he hadn't been staying in the home and that his son ... resided in the home," her inspection report further elaborated that Seals had advised that he had not "stayed in the home in 12 months and doesn't occupy the home full time." But Seals testified that he lived in the home continuously from the time he constructed it until the house was destroyed by fire in June 2017. This conflict in the evidentiary showings requires resolution by the trier of fact.

Moreover, even if a trier of fact were to find LFB's representatives more credible than Seal, summary judgment is nevertheless inappropriate on the showing made. Under the unambiguous terms of the insurance policy, a specific

11

basis for cancellation of the policy by LFB was required under the language of the policy. It is undisputed that the suggested basis that "the insured risk has undergone a material change" is neither defined nor elaborated upon with examples or instances in the policy. Given Seal's testimony that between 2006 until 2017, he resided in the home, at times with another person, including one of two significant others, Dylan, and/or his minor children, Davis's testimony and the February inspection report could support a finding that a change in the manner in which Seal resided in the home had occurred. But the record is devoid of evidence showing that this manner of residency by Seal resulted in a material change in the insured risk to LFB.

An insurance plan serves the purpose of transferring the risk or uncertainty of a loss from the insured to the insurance company in return for a premium; what the insured seeks is certainty of protection from economic loss, whether or not the event insured against takes place. The premium charged by the insurer for assuming the risk of loss is based upon the principle of risk distribution. Although as a practical matter it is virtually impossible for the insurer to predict with certainty whether the loss insured against will occur in fact to a specific structure, it may be possible for it to predict with a high degree of accuracy that a certain group of similar risks will suffer a specific incidence of loss; this predictive ability is what makes a risk distribution possible. The insurer assumes a large number of risks and divides the total loss occurring to the entire group proportionally among the risk pool. See *The Increase-of-Hazard Clause in the Standard Fire Insurance Policy*, 76 Harv. L. Rev. 1472, 1475 (1963).

If this ideal hypothesis is sound, when the insured property is so changed that the insurer would place it in a risk pool in which the proportional payments are higher, the insured who is still allowed to claim the benefit of the existing policy is receiving more than the benefit of his bargain. He is being indemnified either at the

expense of other policyholders or at the expense of the insurer out of capital or profits. 76 Harv. L. Rev. at 1475-76. Thus, it may be concluded that a vacant home can present an increased risk of loss for a fire insurer due to the danger of accidental fires started by vagrants or small children or caused by the lack of care of the premises. 76 Harv. L. Rev. 1479.

LFB has offered no evidence to support its underwriting guideline as testified to by Thomas, i.e., that LFB "normally consider[s] [it] a material change in the risk when the occupancy changes from being occupied by the named insured to being ... occupied by someone else." This record simply fails to demonstrate that the risk pool has changed as a result of the manner in which Seal resided in the Nobles Cemetary Rd property as recorded and testified to by Davis. Additionally, Thomas testified that cancellation of a policy due to the absence of an insured from the insured location depended on "what the circumstances are." The extent of Seal's less than "fulltime" occupation of the home in which his adult son resided was not fully developed, which is an evidentiary showing required of LFB as mover on the motion and the party who bears the burden of proving entitlement to cancellation of the policy in accordance with its terms.[8] Mindful that as drafter of the homeowner's policy, LFB consented to cancellation only in specified instances including "if the insured risk has undergone a material change," we conclude that outstanding material facts remain as to whether the manner in which Seal resided at the Nobles Cemetary Rd property materially changed the insured risk to LFB.

---

[8] Absent evidence demonstrating the nature of Dylan's drug addiction and the risks associated with occupation of a home by him, we cannot say that this circumstance necessarily resulted in a material change in the insured risk to LFB. See *Erie Ins. Exch. v. Com., Ins. Dep't*, 129 Pa.Cmwlth. 120, 123; 564 A.2d 1312, 1313-14 (1989) (insurer presented no evidence that insured's conviction of possession of marijuana with intent to distribute would necessarily result in a substantial increase of risk to the insurance company).

Accordingly, the trial court erred in granting a summary judgment dismissal of all of Seal's claims against LFB.[9]

## DECREE

For these reasons, the appealed judgment is reversed and the matter is remanded to the trial court. Appeal costs are assessed against defendant-appellee, Louisiana Farm Bureau Mutual Insurance Company.

**REVERSED AND REMANDED.**

---

[9] In light of Seal's testimony denying having received a notice of cancellation from LFB, we question the trial court's conclusion that LFB sustained its burden of proving no genuine issues remained under an application of La. R.S. 22:887. See *Manh An Bui v. Farmer's Ins. Exch.*, 2010-1571 (La. App. 1st Cir. 6/10/11), 68 So.3d 656, 660, writ denied, 2011-1505 (La. 10/12/11), 74 So.3d 212 (material issue of fact raised by affidavit alleging non-receipt when insurer only offers affidavit alleging proper mailing). See also *Easom v. Foremost Ins. Co.*, 2012 WL 5457376, at *4 (W.D. La. Nov. 1, 2012) (suggesting Louisiana courts tend to treat the question of whether the presumption of delivery has been rebutted as a question appropriate for determination by the fact-finder). But because we have concluded outstanding issues of material fact remain on the propriety of the antecedent basis for LFB's cancellation under the terms of the homeowner's policy, we pretermit such a discussion.